versus the Magyar Bank Mr. Pabitch. Good morning, Your Honors. Robert Pabitch here on behalf of the plaintiffs and appellants. We're breaking up this argument into two parts. I'm taking the Keoghl argument aspect of this, and Mr. Leon is taking the forum nonconvenience issues that also arise under the Erste case, Your Honors. This court has asked all parties to take the United States Supreme Court decision in the Keoghl versus Royal Dutch Shell into consideration, insofar as how it may affect the issues in our case. The issue that was identified, the question that was identified by Justice Roberts in the Keoghl case was whether and under what circumstances courts may recognize the cause of action under the alien tort statute for violations of the law of nations occurring within the territory of a sovereign other than the United States. The defense position, Erste's position on this case is that if the relevant conduct occurred outside the United States, there is no ATS jurisdiction. That simple, straightforward, and blatant reduction of ATS jurisdiction is not warranted under the Keoghl case. The Keoghl case leaves open for other cases the consideration of whether or not there are circumstances that touch and concern the territory of the United States, so as to rebut the presumption against the application of U.S. statutory law extraterritorially. The position that the defense has taken would, for example, be inconsistent, for example, with the Sosa case, which involved what we call triple-cubed parties, foreign defendants, foreign plaintiffs, foreign conduct. It would also be inconsistent with the concept of piracy. I think all of us recognize that piracy is likely to occur outside the sovereign territory of the United States. Does it occur within the sovereign territory of another sovereign? It is considered to be, according to Justice Roberts, the analogy he makes is yes. It is considered to be similar to the territory of another sovereign. That is the reference that Justice Roberts makes to piracy. He makes that analogy. Whether it be a sovereign ship of another nation, et cetera, but he does make that analogy. It's clear, however, that it's outside the territory of the United States. Is it within the territory of another sovereign? That's a more technical question, but Justice Roberts has put forth the possibility, yes, it can be considered to be within the territory of another sovereign, because that sovereign may be flying its flag, just as an embassy is considered to be the territory of the sovereign. I make those two examples, Your Honor, simply to point out that there's a history here that would certainly question the broad proposition of the defense that any time conduct occurs outside the territory of the United States, the ATS would not apply. Now if we look at the presumption itself and how that presumption was applied by the Roberts Court, we first look at the presumption, and that was the presumption under Morrison, which is a presumption that relates to congressional statutes. We are not here applying or attempting to apply U.S. law in a foreign land. The presumption here does not have that weight. The presumption here is where we are applying not U.S. law, but the universally accepted laws of international law that regard genocide as a crime against humanity. So we're not here applying a U.S. statute in a foreign country. We are, in fact, applying nothing more than universally accepted violations of international law, a very narrow band of those, including genocide. So the presumption has somewhat less weight in that regard. For example, in the Morrison case, they used the focus test. That was a test that's used to apply the focus of the Congress in terms of passing a federal statute. Here, Justice Roberts did not go with a focus test. He's established a touch and concern test, and that test reflects, again, the less weight that might be given to this presumption under these circumstances. Touch and concern can be seen as broader than focus. So the presumption in and of itself is a presumption that carries less foreign policy considerations because we're not attempting, we're not asking this court to apply U.S. statutory law. We're asking it to apply internationally accepted norms of conduct universally considered to be in violation of international law. That's the first point. The second, there's deference that should be shown to the sovereignty of a foreign nation. But under these circumstances, Your Honor, I suggest that the foreign policy of the United States was not referring to the sovereignty of Hungary in 1944. In fact, it was the foreign policy of this country in 1944 to destroy the sovereignty of that nation. We had declared war against Hungary in June of 1944. So our foreign policy was not in any way deferring to the sovereignty of the nation where this conduct was occurring. So again, the presumption should, under these circumstances, have less weight. Thirdly, the country that, again, where the presumption that goes against the application of U.S. law to the territory of a sovereign, let us look at the sovereign itself. We are talking about Greater Hungary, not Trianon Hungary, an important distinction. Greater Hungary was itself the product of an illegal annexation of Yugoslavia and several other countries. So that insofar as we should be deferring to the sovereignty of Greater Hungary, I suggest to you that that, again, should have less deference, because we're not talking about respecting or deferring to the sovereignty of a nation that was recognized internationally as having legitimate borders, but just the opposite. In the statement, for example, of interests that was filed in this case by the United States government, the term Greater Hungary is defined on page 15, footnote 7, refers to the territory controlled by Hungary in 1944 and includes the legally recognized territory of Hungary, as well as territories that were illegally annexed by Hungary during World War II. Finally, again, as to whether we should respect the territorial integrity, sovereignty of this country in 1944, we turn to the fact that that country had, in fact, declared war against us, that we were at war, and that certainly that war touched and concerned us. As to that war, it has been defined in the Nuremberg Convention, and I believe it's paragraph 100 of our complaint, that war was defined as an aggressive war in violation of the laws of international law that constituted a crime against humanity. So at that point, we were confronted with a nation whose borders were illegitimate, that we were not only deferring to their sovereignty, but attempting to destroy it. I believe under all these circumstances, the presumption would have less weight, far less weight than in the Morrison case. Mr. Pavich, in your briefs, you all also rely for jurisdiction on, if I understand it correctly, CAFA jurisdiction under Section 1332, correct? That's correct. An interesting question about extraterritorial presumptions in that context, but what law do you think would apply to your claims that are subject to jurisdiction under Section 1332? Under CAFA, Your Honor? Yes. I believe it would be European law, it would have to be the law of the country in which the conduct took place. It would be Hungarian law? Yes, Your Honor, some form of Hungarian law, yes. I'm not up to date on exactly what that law was at that time, but I do believe that we would have to rely on Hungarian law if we were to come under CAFA, that's correct, Your Honor. Okay, thank you. So, Your Honor, then we go to under what circumstances should this presumption be rebutted? And we believe there are two compelling circumstances here, that first, I've suggested to the Court that the presumption has much less weight, for all the reasons I've given. Secondly, what are the aspects of this that touch and concern the United States? The aspect of what? Of this genocide, of this conduct. And touch and concern, I think, if we try to give it a little bit more flesh, a little bit more body, we might look at Justice Breyer's concurring opinion when he talks about national interest. What is in the national interest? I suggest that in trying to determine what touch and concern means, I would suggest that if something affects our vital national interest, it can be said to touch and concern the territory of the United States. The question I put to the Court, and I put to Counsel for IHRSA, did World War II touch and concern the United States? Why do I put that question to the Court? Because the Axis powers, Hungary in particular, relied upon and depended upon the acquisition of Jewish assets. They relied upon the actions taken, the genocidal actions, to fund and fuel the war machine. We cited the statement of the Hungarian Prime Minister in 1944 in our complaint, wherein he said that the assets that had been confiscated from the Jewish population would be used to support military operations. We also have pointed out in our complaint, I think well-researched, that somewhere between 25 and 30 percent of the war cost of Hungary, Germany, was financed by the Holocaust. This was an essential part of the war that had been declared against us. Just as our civilian effort in World War II was essential to our fighting this war. What percentage did you say, sir? 25 percent in Hungary, 30 percent overall. Thirty percent of the German effort throughout Europe, 25 percent of the Hungarian war effort was funded by the Holocaust. Our civilian population, World War II required total commitment of the civilian population. On our side, it was voluntary, war bonds, jobs. On the other side, the Holocaust was the sacrifice that had to be made, not a voluntary sacrifice. We have the acquisition, the taking of property, not war bonds. We have slave labor to build the railroads. We have sacrifices that were not even limited, your honors, to the living, but the dead. Operation Reinhardt, something called Dental Gold, your honors. Dental Gold was something that required in the reports that we cite in our complaint under the report of Ambassador Eisenstadt, it referenced Dental Gold. Dental Gold under Operation Reinhardt, of course, was the sacrifice made by the Jews who were no longer living. It was taken from them, the minerals taken out, put on the train. So this was a total commitment. The Holocaust, the genocide in Hungary was a direct, necessary, essential contributing factor to World War II. Post-March 1944, we took battle casualties in Europe, 478,389 battle casualties in the European theater in 1944, 1945, 228,548 battle casualties in the European theater post the institution of the Hungarian genocide. Did World War II touch and concern the United States? Obviously. Was the Holocaust a contributing, necessary contributing factor to World War II as fought by the Axis, as fought by the Hungarians? Yes. Hungarian Prime Minister has told us in 1944, these assets will be used to support military operations. Secondly, not only did World War II touch and concern the United States, the vital interest of the United States cannot, is there any greater vital interest in our country than to preserve its own sovereignty? Our sovereignty, our existence was at stake. If that doesn't touch and concern, then there is no such thing as touch and concern under the case, Mr. Kanzer's argument, if it's accepted, there's nothing we can say. We have to admit, World War II occurred outside the territorial boundaries of the United States in the European theater. There may have been a couple of saboteurs who were captured in New Jersey, I'll put those aside. We will admit for purposes of this case, it was entirely outside the territorial boundaries of the United States. Secondly, did the genocide itself, not just as it contributed to World War II, touch and concern? I refer your honors to that whole section of our complaint, the nexus section from 77 on, where we repeatedly pled with the Hungarian government and warned them against the genocide. President Roosevelt called it the blackest moment in world history, our first president to talk about it. President Obama as late as 2012 again referred to it as one of the blackest moments in world history. 1944 and 2012, it has continued to be in the national interest, foreign policy interest of this nation to see, first in 1944, to stop it. You'll see the cables that are referred to. We attempted to reach the Swiss, we attempted to reach the Vatican, we attempted to go directly to Hungary to say stop, stop what you're doing, and we were rebuffed. That expressed our national interest that it touched and concerned. It seems ironic now that we're being told in the companion case that we had no responsibility for this. It wasn't us. Our government didn't consider it to be something other than the Hungarian government that was carrying out this operation. That's why those cables were- Pavic, what do we make of this government's statement of interest? You're telling us it ought to be in our national foreign policy interest to pursue this remedy, and the State Department has filed papers in this case saying, please stop. No, they haven't said that, and I'll try to address that, Your Honor. First, I think the statement of interest shows an interest. That's first of all, and it shows and reflects the policy of the United States government and the goals of the United States government are reflected in the statement of interest. For example, first, it is an important policy objective of the United States to bring some measure of justice to Holocaust survivors and other victims of Nazi era. Now, this statement of interest simply says, Your Honor, that if there's a legally compelling reason or a legal reason to not pursue this case, then the courts can take that into consideration. We will, and have already pointed out to the court that there are reasons for that. Number one, the German fund that was set up was applied to slave labor. We are not seeking compensation for slave labor in this case. Number two, the fund that was created in 2001 that they're seeking here to have this court take into consideration, actually October of 2000, was a fund that was created before Ersta did the taking in this case that is the subject of our claim against Ersta. Ersta's taking did not occur until 2003. I simply point this out, Your Honor, to point out that we- You mean it's acquisition? Yes. Okay. I'm calling it a taking. It's acquisition, yes. It's a little different, yeah. Yes, Your Honor. And so when it comes to that point, the first time that we came up in this case, Your Honor, my papers fell as I was approaching the bench. They've at least had the decency to let me get out a few words today before I have to bend over and pick them up. I'm not going to pick them up at this point. I'm going to continue the court. So the point is we feel that for purposes of what we're looking at now, the statement of interest supports us. The statement of interest shows a continuing interest. Now, whether that might require this court or another court at some point to say no to our claim is an issue we will deal with. We believe that it won't. There's no question here in the statement of interest that the United States continues to have an interest, a vital interest, in seeing that Holocaust survivors get some measure of justice. So we don't run from it. We embrace it. I'm sorry, Your Honor? Your time, you can eat into the rest of your time, but it's- Your Honor, if you have any questions, no, I don't want to eat into my rebuttal. And obviously, I not only have the red light, but I have my own papers telling me it's time to sit down. All right, thank you. We'll hold the clock while you pick up your papers. I appreciate that. We have Mr. Leon. What pro-counsel is for you, Your Honor? Just, if it may please the court, just two minutes. I'm not going to repeat myself on the FSIA issues. We'll see if counsel for the bank has anything different to add, and we'll address that in rebuttal. I'm going to just spend a minute or two talking about form non-convenience, which was previously rejected by the district court. And the district court said that even if the Hungarian courts provided an available and adequate alternative forum, defendants have not shown that the convenience of the parties or the interest of justice would be best served by the dismissal of the instant action. That was a few years ago. There was a complete reversal by the district court in its opinion, and it only wrote a page and a half long opinion getting it. And we don't know what's changed other than its belief, which even though it criticized our evidence on FSIA for being speculative, it's speculative belief that the plaintiffs would in fact go to Hungary to exhaust. And if we did that, well, maybe it would be more convenient. They assume that a lot of things, like the cases would be joined together in a single court, that witnesses would be more available in Hungary, but not a single witness has been specified who is in Hungary who would need to be made available. The availability of third parties and the amenability to subpoena when not a single third party has been identified. There were no findings, and Judge Williams, you and I had a discussion the last time I was before you about the importance of the district court doing its job, making findings so that the abuse of discretion standard can be evaluated, and I submit that the district court failed here. And the Royal 10 Kate case, which we cited on page 34 of our opening brief regarding Ersta, is a Fifth Circuit case from March of this year, which reversed and remanded because the district court didn't make findings on one particular fact. And here we have no findings on any facts. And that was, who were the witnesses? Because each side has witnesses they claim would be convenienced. We know our plaintiffs are going to be inconvenienced. Who exactly is inconvenienced on their side by having to come here? They didn't tell us. There's no specificity. So we believe that form non-convenience is inappropriately granted here, and the district court should be required on remand, if it's going to continue to entertain the motion to make specific findings based on specific evidence and weigh all the relevant public and private interest factors. Thank you. Thank you, counsel. Mr. Kanzer. Good morning. I'm Alan Kanzer. I represent defendant Ersta Group Bank, an Austrian corporation. I'm going to address the question of subject matter jurisdiction, then my colleague, Amber Wessels-Yen, will discuss. Mr. Kanzer, if you keep your voice up. I'm sorry. There you go. I'm sorry. I've got a bad cold and it makes it more difficult. Before I turn to the seminal Kia Bell case, in light of comments that have been made today regarding the horrors of the Holocaust, I just want to emphasize there is no allegation in the complaint that Ersta participated in any matter whatsoever in the Holocaust. The allegations relating to Ersta all relate to an acquisition that it made over 50 years after the Holocaust of Hungarian banks that purportedly had tainted assets. Ersta has put in an answer denying all the material allegations of the complaint. The truth or falsity of those allegations are frankly not before the court on this appeal. Kia Bell is probably the most important ABS, excuse me, ATS decision that has been rendered since SOSA itself. In Kia Bell, the Supreme Court looking to first the history of the ATS and then to public policy, namely concern over what the implications on U.S. foreign policy would be if U.S. courts adjudicate disputes of a highly sensitive nature that relate exclusively to conduct abroad. The court created a presumption, a presumption that the ATS should not be applied extraterritorially when all of the conduct involved occurred outside of the United States. Now the court recognized one circumstance under which there might be an overcoming of that presumption and that was if the conduct involved touched and concerned the United States in a substantial manner. Now I'd like to point out that while we didn't hear it right now in the briefs of the plaintiffs, their first attack on Kia Bell is that the decision was rendered by five justices and not by more. Well, I'm aware of absolutely no authority and certainly they haven't cited any that an opinion by five justices is entitled to less respect, less validity and is less binding on lower courts than one of a greater supermajority. The second point is they have made the argument which we heard today that they come within the touch and concern language. I think they are misreading the touch and concern language. The touch and concern language as counsel recognized stems from Morrison and the touch and concern language in every court post-Kia Bell that has construed it has been limited to circumstances in which the conduct that is the subject matter of the claim involved the United States, meaning that it occurred at least in part in the United States. There is no authority whatsoever that I'm aware of or that they have cited that suggests that the test of touch and concern is instead whether or not there is an impact on the United States. That is simply not the law. Now, let me point out that at least three courts of appeals since Kia Bell have taken the straightforward position that if all of the facts and actions related to the claim occurred abroad, that simply ends the matter right there and then. There is nothing further to consider. That is the position that the Second Circuit articulated in Ballantulo. Recently, the Eleventh Circuit in Chiquita has done the same. And I would respectfully submit that this court in Korber did the same thing because in Korber, this court succinctly held that when, and I'm going to quote it now, plaintiff's claims, quote, did not survive Kia Bell, which holds that Section 1350 cannot be used to contest the acts of foreign nations. Within their own borders. Now, today, Mr. Pavich hasn't commented on Kia Bell, on Korber. In his brief, he tries to make the argument that there's a distinction because that involved the government of Germany and somehow this case does not involve Hungary's government. Well, that's just not paying any attention to the allegations to the complaint. The allegations, which in fact he was just relying on, are that as a result of the confiscation of Jewish deposits in Hungarian banks, a confiscation which took place, I emphasize, because the laws and decrees of the Hungarian government, required it, the Hungarian banks turned those funds over to the Hungarian state. That is state involvement. There's no question that we're dealing with the same type of situation as this court addressed in the Korber case. You say you turned the funds over. Was there any retention of monies from that, that you used for administrative costs and so forth? Consequently, one does not segregate those deposits on the books of a bank. One simply puts them in the general funds of the bank and uses them for many, many, many purposes. Now, there is no way of telling what happened specifically to any plaintiff's money, if it ever got to that stage. And let's also not forget that we are dealing with a situation many decades later. In the interim, there was a communist takeover of Hungary, which resulted in the nationalization of all the Hungarian banks. There was subsequently a reprivatization. I don't think anybody would be in a position to trace what happened to any assets whatsoever. I understand what you're saying. You would be able to identify a certain amount in an account that was taken over, and also a certain amount that was transferred then to the government, would you not? I don't know whether those records exist at this point, Your Honor. We're dealing, after all, with an interval of over 60 years. And I do know, speaking of my own personal knowledge, because I worked with a client in trying to investigate what, in fact, happened to what, for want of better words, I'll refer to as Jewish assets. There's no way of knowing. It was not recorded on the books and records of any bank that was acquired that these were, in fact, the assets that had been deposited by Jewish depositors. So there is no way of telling. If I may move on to cases that have construed the touch and concern language, the most prominent one is al-Shamari, which is a Fourth Circuit case involving the horrors that took place in Abu Ghraib prison in Iraq. There, the court said, we will take jurisdiction because the plaintiffs allege, and I'm quoting now, acts of torture committed by United States citizens who are employed by an American corporation which has corporate headquarters in Virginia. The alleged torture occurred at a military facility operated by United States government personnel. That is a total world away from the allegations of this complaint, which do not include the United States action at all. Indeed, if I may point out another case, the Ninth Circuit has very recently in Nestle said the plaintiff's complaint does not give enough information for us to be able to make a determination as to whether or not the touch and concern language is implicated. They therefore remanded to the district court to give the plaintiffs an opportunity to file an amended complaint which they directed should specifically identify what conduct took place in the United States. I remind this court that the plaintiffs have already filed, in our case, a post-Keyabel complaint. They did so prior to the time we made our motion to dismiss for lack of subject matter jurisdiction. So they've had their chance, and they cannot come up with any activities. I don't wish to do that, so I will thank the court and allow her to continue. Thank you, Mr. Kanzer. Ms. Wessels-Yen. May it please the court. My name is Amber Wessels-Yen, and I will argue the form nonconvenience issues on behalf of Defendant and Appellee Erster Group Bank. A dismissal for form nonconvenience is within the sound discretion of the district court. It may be reversed only for clear abuse of discretion. In this instance, the district court acted well within its sound discretion when it found that Hungary is an adequate alternate forum for these cases for the reasons discussed in the Seventh Circuit's 2012 opinion regarding the sovereigns and for the reasons discussed by the district court in its sovereign immunity holdings. The trial court also acted within its sound discretion when it properly applied and balanced the relevant private and public factors to determine that they weighed strongly in favor of dismissal of these claims so that they can be brought in Hungary. With regard to the adequate alternate forum issues, the district court noted that while plaintiffs do have fears and concerns, those do not affect the adequate alternate forum analysis. The district court relied on its prior holdings and the Seventh Circuit holdings to find that the Hungarian courts are clearly the best forum in which to resolve the claims brought against Erster, and that there is no evidence that the Hungarian courts do not offer an adequate alternate forum. If the district court also acted within its sound discretion when it cited this court's prior opinions language, that Hungary is where much of the evidence and surviving witnesses are located, and decided that particularly with the dismissal of co-defendants, not only the sovereign but also prior co-defendants OTP and MKB, that non-party Hungarian language documents and witnesses are outside of the subpoena power of this court. Moreover, they're outside of the jurisdiction of this court, whether because of personal jurisdiction issues or because of foreign sovereign immunity grounds, and that therefore Erster would not be able to seek to implead or to seek any contribution on claims that plaintiffs have alleged total approximately $75 billion, and for which plaintiffs have sought joint and several liability. As this court noted in its 2012 Magyar Nemzeti opinion, that's approximately 40% of Hungary's annual GDP. Plaintiffs make much of Royal Tenkate. That is the only decision I believe they have that looks at the district court's sound discretion. The Lintner case from the Second Circuit and the Lueck case from the Ninth Circuit both look at a district court's sound discretion and determine that it should be respected. In the Royal Tenkate case, the only issue was the location of witnesses. Here we have several additional private interest factors. In fact, plaintiffs themselves in a hearing before the district court had noted that they were facing difficulty with obtaining discovery from plaintiffs who were located in Israel who did not speak English or Hebrew. Counsel, we don't have much of a record here on locations of witnesses and documents and so on. Not the kind of record one would ordinarily expect to see with a forum non-convenience dismissal. The court also decided that there were additional private interest factors. The location of witnesses and documents is not the sole private interest factor that the district court examines. The impleter and contribution issues and the resulting danger of inconsistent verdicts and of comity issues regarding a U.S. district court sitting in judgment on a foreign nation's actions are additional strong factors. Another very strong factor is the need to perform a choice of law analysis and to apply foreign law to the issues. Plaintiffs have just said they believe that foreign law applies. The foreign law that we're talking about with respect to Erzségroup Bank, given the 60 years of successorship arguments that plaintiffs would need to make, would involve the need to not only look into and interpret the effect of Hungarian laws from as early as 1916 and 1920 establishing predecessor banks, but to also determine the effect on successorship of not only Nazi era control of the banks, but then communist nationalization, privatization, re-nationalization and re-privatization of the banks over a period of 60 years under multiple legal regimes in Hungary. And the need to apply foreign laws over multiple decades with several different conflicting opinion analyses is also the sort of private interest factor that many courts have found militates strongly in favor of the foreign adequate alternate form. Thank you. You're eating almost all your Coke house's time. We'll give the last counsel two more minutes and two minutes to this side as well. I will talk extra fast, Your Honor. Anthony Passioni on behalf of Magyar Nemzeti Bank, the National Bank of Hungary. I'm here to talk about the Foreign Sovereign Immunities Act issue, which was argued in the first case, and I don't want to rehash old ground, but I do want to bring back the discussion and the argument to the question that's properly before the court. And that question is whether the plaintiff showed in the court below that they exhausted remedies that are or were available in Hungary or provide a legally compelling explanation for their failure to do so. In the court below, my client and the National Railroad put in ample evidence to demonstrate that the Hungarian judicial system was a fair, independent system. We referenced specifically pieces of legislation, the Constitution, the basic law. We outlined the way the judiciary is set up, which levels of the judiciary will handle which claims. We outlined the appellate process in that case. We pointed to the European Commission of Human Rights and other safeguards to review the independency of the judicial system. We referenced U.S. cases, which cited and acknowledged that Hungary indeed was an independent judiciary. MAB put in its brief references to Hungarian cases where Jewish plaintiffs were given recourse in certain cases. In response, what the plaintiffs did was virtually nothing. They did not put in a piece of evidence where a claim brought to the Hungarian judiciary was rebuffed. They did not point to a statute which suggests that there was a blocking of a plaintiff's claim in this scenario. They did not point to evidence of a judge who was deemed to be impartial because of prejudices against Jewish Holocaust victims. In fact, what they did put in was an admission by their own expert who exclaimed that prior to the period of 1989 and 2011, Hungary indeed had a judiciary that was fair and independent. And yet they offer no explanation as to why their plaintiffs did not bring claims during that period for recompense against my client or the National Railroad. In fact, we went so far as to outline specific claims in our brief that could be brought civilly against the branch that I represent in the national government. So for those reasons, I heard a lot of complaints about the record being thin in the court below. It was thin, and it's their own fault that it was thin. They did not put in the evidence to demonstrate a compelling reason for not bringing these claims at any period, and particularly during the period 1989 to 2011. And it would put this court, a court in Chicago, Illinois, with all due respect, having to adjudicate a claim against the national government about claims that occurred and occurrences in a national country in Hungary a long time ago against its own citizens. Or Hungarian nationals. It's the comedy that's required and is acknowledged by this court's prior decision is clear, and the exhaustion and the evidence below was non-existent, and this court should simply affirm the district court below. Thank you. Thank you. Yes. You can. Yes. I gave two more minutes. Seven and three. Eight and four. You've got about two minutes. Okay. I first want to discuss the form nonconvenience issue. Part of the opinion that Ms. Wessels read actually shows how the district court conflated the jurisdictional consideration of the FSIA and the discretionary aspect of form nonconvenience. They're not the same thing, and they have different standards, and the district court applied one into the other. And the district court also did not go factor by factor in showing how it weighed the convenience factors. And Ms. Wessels actually raised a point which actually makes our point. She discussed impleeding third parties, but she still hasn't said who she would impleed. We can't evaluate whether, for example, if they were to impleed the government of Germany. Well, the government of Germany is not beyond the power of this court to sue. Would they impleed the Hungarian government? Well, that might be interesting to know. What about the private banks that you sued and that we said you could not sue in the United States, that you wanted joint and several liability for? Maybe they would, and maybe they wouldn't. I think we'd have to look at that and see what they intended to impleed them for and whether they could wait, lose here, and then sue in Hungary to recover in contribution. They're very common in the U.S. courts for somebody to sue, for example, their insurance company afterwards for having lost it. I assume you're seeking damages well exceeding their net worth, particularly with joint and several liability of $75 billion. Yeah, net worth, but with the National Bank together as a co-defendant here in the United States. On the FSIA issue, it appeared that counsel blamed plaintiffs for not having tried to exhaust before Hungary started to slide backwards, and that's not a particularly fair statement. Casseray would not have directed us to do it. We believe international law wouldn't have directed us to do it, and the question is now. We've been ordered to exhaust now, and the question is can we do so fairly, and we believe that we can't. And the last thing I want to say is about all the Holocaust-era cooperation that they're talking about. All that occurred before these constitutional reforms, which caused so much damage to the independence of the judiciary, went into place, and none of them involved suing the Hungarian government, which is the particular problem here. Nobody denies that there were participants in the Holocaust who can be sued. The government in the Constitution denied responsibility, saying it wasn't sovereign, and it was the Germans who did it, not them. Thank you. Thank you. I'll give you two minutes. Your Honor, we believe that reading Kiobel to require that all conduct, that any, if all the conduct that was outside the United States ends the case is not a proper reading of Kiobel. That is the beginning of the touch and concern analysis. If Justice Roberts wanted to say that all the relevant conduct here was outside the United States, he could have said that and said that's the end of it. But he then went on to say, and did not, touch and concern the territorial interests of the United States. As Mr. Kanzler has pointed out earlier, the Shomari case is one that he points out and relies on as involving U.S. conduct, but the Shomari case emphasized the concurring opinions in the Kiobel case, and in particular Justice Roberts' opinion, wherein he said that we need to flesh out. It remains yet to be seen with further cases. Other cases may arise with allegations of serious violations of international law principles protecting persons that are covered neither by the TVPA or by the reasoning and holding of today's case. So Justice Roberts is clearly leaving it open, the question open as to whether conduct outside the territorial boundaries of the United States are covered by ATS. Justice Breyer makes it very clear, and he has four justices with him, and that is under three circumstances, he wouldn't even apply the presumption, but he finds the national interest of the United States is met when the conduct is within that narrow band of conduct that constitutes crimes universally seen by the international community as being contrary to international law. Justice Breyer, in three concurrences, would say that genocide, if the conduct that we're talking about is genocide, that in and of itself would touch and concern. Justice Breyer leaves that open. Justice Roberts makes it, it seems to me, clear that it's not the end of the discussion to determine that all the relevant conduct took place outside the United States. It is the beginning of the touch and concern discussion. I will acknowledge that if this Court holds that the Fiobol case requires all conduct to be, that if all the relevant conduct is outside the United States, we lose. But that is not a proper reading of that opinion. It's not the concurrence, it's not even the majority opinion. We believe that if touch and concern has any meaning, if there is any conduct outside the United States that touches and concerns the United States, it is the unique circumstances of this case, World War II and the Holocaust itself. And the interest of the United States continues right up to the present day when statements have been made by the Commission. In May of 2014, Leslie Weiss, Chair of the U.S. Commission for the Preservation of America's Heritage Abroad, stated that I express my concern as Chair of the Commission, but also as a daughter of a Hungarian survivor of Auschwitz, about the memorial statue to the German occupation of Hungary and urge that the monument reflect the historical truth about the Holocaust in Hungary. If touch and concern. Thank you. Thank you, Your Honor. Thanks to all counsel. The case will be taken under advisement.